**SO ORDERED.**

**SIGNED this 24 day of August, 2023.**



_____
**Joseph N. Callaway
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | |
| **DAVID DOV GROSS** | Case No. 22-00517-5-JNC |
| | Chapter 7 |
| Debtor | |
| | |
| **SMARTSKY NETWORKS, LLC,** | |
| v. | Adv. Pro. No. 22-00109-5-JNC |
| **DAVID DOV GROSS,** | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff SmartSky Networks, LLC ("Plaintiff" or "SmartSky"), filed a complaint in this adversary proceeding (Dkt.1) on June 13, 2022, amending it as a matter of right on June 17, 2022 (Dkt. 4). Pursuant to 11 U.S.C. § 523(a)(6), SmartSky seeks a judgment excepting the debt owed to it by David D. Gross (the "Debtor") from the general discharge granted in his chapter 7 bankruptcy proceeding 22-00517-5-JNC (BK Dkt. 37). Debtor contested the nondischargeability

1

assertion in an answer filed August 12, 2022 (Dkt. 10). The parties filed cross motions for summary judgment with supporting memoranda (Dkts. 29-32) and timely responses (Dkts. 40-41). As explained in the order on summary judgment (Dkt. 45, the "Summary Judgment Order"), Debtor's motion for summary judgment was denied, and Plaintiff's motion was granted in part and denied in part. Specifically, on principles of collateral estoppel, the findings of an arbitration panel (identified below) bar re-litigation of the willfulness issue, leaving the question of maliciousness under section 523(a)(6) as the sole issue for trial. A trial was held on July 19, 2023, in Greenville, North Carolina. After the conclusion of the trial, the court allowed the parties to file of post-trial briefs (Plaintiff at Dkt. 56); (Debtor at Dkt. 55). This matter is now ripe for adjudication.

## JURISDICTION

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine. Dischargeability of a particular debt is specifically defined as a core proceeding in 28 U.S.C. § 157(b)(2)(I) and (J), and 157(c)(2). Further, the parties consented to this court entering final judgment on all matters raised in the adversary proceeding. (*See* Pretrial Order of July 13, 2023, Dkt. 46). This court has constitutional authority to enter final judgment in this adversary proceeding. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1947 (2015).

## PROCEDURAL HISTORY

On March 10, 2022, Debtor filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code, Case No. 22-00517-5-JNC. On March 21, 2022, Debtor filed a summary of assets and liabilities (BK Dkt. 12). Among his liabilities, Debtor identified and listed a judgment

2

for $2,548,892.04 entered against him on February 7, 2022, in the United States District Court for the Middle District of North Carolina (the "MDNC") in *SmartSky Networks, LLC v. Wireless Systems Solutions, LLC*, Case No. 1:20-CV-00834, after consideration by it of Plaintiff's Motion to Confirm Final Arbitration Award (MDNC Dkt. 166, 194, 195). The judgment arises from a two-week arbitration hearing that resulted in a binding and final award for SmartSky against Debtor of $2,548,892.04 for attorneys' fees, costs of arbitration, and sanctions (the "Award").[1] On June 13, 2022, Plaintiff SmartSky initiated this Adversary Proceeding objecting to discharge of the Award under 11 U.S.C. § 523(a)(6) as a debt founded in willful and malicious injury.

## FACTUAL BACKGROUND

SmartSky provides broadband air-to-ground ("ATG") wireless communications systems for use in traveling aircraft. In 2017, it contracted with Wireless Systems Solutions, LLC ("WSS"),[2] to develop SmartSky's existing proprietary ATG products into a commercially viable form. For years, SmartSky had been developing ATG technology geared towards serving aircraft in flight, both private and commercial, that would bounce seamlessly between ground cell towers as the aircraft traveled across country (Award, ¶¶ 100-104). The business relationship was

---

[1] Debtor contends the judgment on the Award is void based on lack subject matter jurisdiction by the MDNC. He appealed the matter to the Fourth Circuit Court of Appeals. *SmartSky Networks, LLC v. DAG Wireless Ltd*, No 22-1253, Fourth Circuit Court of Appeals, where it remains pending. However, regardless of whether the MDNC held jurisdiction sufficient to issue judgment, the Award remains a "debt" as that term is defined at 11 U.S.C. § 101(12) ("means liability on a claim"). There is no requirement that a "debt" be reduced to final judgment prior to filing a bankruptcy petition for exception to discharge purposes. *See Sverdrup Corp. v. WHC Constructors, Inc.*, 989 F.2d 148, 154 (4th Cir. 1993) ("The FAA supplemented rather than extinguished any previously existing remedies" finding, therefore, that "an action at law remains a viable alternative to confirmation proceedings under § 9 [of the FAA]" as a means to enforce a final arbitration award) (citations omitted); *see also In re Deerman*, 482 B.R. 344, 359–60 (Bankr. D.N.M. 2012). The same parties arbitrated the original dispute and are bound by the specific findings made by the Tribunal in the Award, regardless of the outcome of a challenge to jurisdiction for reduction to judgment purposes.

[2] WSS is controlled by Laslo and Susan Gross, who are the parents of David Gross. WSS filed a chapter 11 bankruptcy petition in this court on March 9, 2022, case no. 22-00513. Its case was converted to chapter 7 of the Bankruptcy Code on October 12, 2022.

governed by several agreements between the parties, including a contract known as the "Teaming Agreement" (See, e.g., Award, at ¶ 133). During the performance of these agreements, David Gross began by working directly for WSS, and later as a subcontractor following his formation of DAG Wireless Ltd. and DAG Wireless, LLC (collectively "DAG") (Award ¶¶ 12, 173-176).

The honeymoon did not last long, as on September 10, 2020, SmartSky filed a verified complaint against Debtor, Laslo Gross, Susan Gross, WSS, and DAG ("Respondents") in the MDNC, alleging ongoing breaches of the intellectual property and confidentiality provisions of the Teaming Agreement plus committing unfair and deceptive trade practices, false advertising, and misappropriation of trade secrets. Four days later, SmartSky filed a parallel Statement of Claim with the American Arbitration Association (the "AAA") asserting these matters as arbitration claims against WSS for damages arising out of breach of contract (the "Arbitration").

DAG filed a motion to dismiss or compel arbitration of SmartSky's claims in the MDNC case, and WSS moved the MDNC court to compel arbitration of all claims and counterclaims between SmartSky and WSS. The MDNC court granted WSS's motion finding that the Teaming Agreement required all claims, other than claims for interim injunctive relief, between SmartSky and WSS be arbitrated (Award ¶ 43.) By January 13, 2021, SmartSky and Respondents had agreed to consolidate all claims and counterclaims in the Arbitration and to be bound by the results (Award ¶ 48). The arbitration hearing occurred from May 10 through May 21, 2021, in Charlotte, North Carolina, and its three-person panel (the "Tribunal") heard from nine fact witnesses and four expert witnesses. It also reviewed 348 presented exhibits (Award ¶¶ 77-79). On October 1, 2021, the Tribunal issued the Award, consisting of an 81-page opinion with 427 detailed findings of fact and conclusions of law (Dkt. 33, Ex. A).

The following facts, as found by the Tribunal, were previously noted in the Summary Judgment Order, and are deemed established and binding in this adversary proceeding.[3]

1. WSS is a family business, managed by Laslo and Susan Gross. Ownership was held by Susan Gross (99%) and her son Michael Gross (1%) until August 3, 2020, when Susan Gross transferred her interest to the Gross Family Protection Trust. August 3, 2020 is the same date that WSS received SmartSky's letter notifying WSS of material breaches of the parties' agreements. (Award ¶ 169.)

2. Debtor has been an employee of WSS and signed a non-disclosure agreement with SmartSky in 2019 on behalf of WSS. (Award ¶ 172.)

3. DAG Israel was formed February 27, 2018, and DAG USA was formed June 19, 2019 (Award ¶ 173.) WSS was DAG Israel's only customer. (Award ¶ 176.)

4. In August 2020, DAG Israel issued a press release announcing, "the launch of the Velocity XG System, a new wireless broadband solution for inflight connectivity." The release represented that the system was "FCC and DO-160 certified" and that it was currently commercially available. (Award ¶ 178). The photos in the press release were photos of the products WSS built for SmartSky. (Award ¶ 179.)

5. Debtor communicated with [REDACTED][4] regarding the Velocity XG system. (Award ¶ 182.) He also communicated, by using a WSS email address with [REDACTED] regarding marketing the Velocity XG system. On behalf of DAG Israel, he communicated with [REDACTED] and sent to [REDACTED] the Velocity XG Package. (Award ¶ 184.)

6. In November 2020, David Gross was quoted in an article in CTech reporting that DAG Israel had announced the launch of its Velocity XG System. (Award ¶ 188.)

7. David Gross admitted the assertion that Velocity XG Package was a commercially available, existing system was false at the time the advertising occurred and at the time of the arbitration hearings. (Award ¶ 189.)

8. In April 2021, Debtor, along with Laslo Gross, made a detailed zoom presentation to several people regarding the supposedly existing ATG wireless system. During the presentation, Laslo Gross and Debtor "bad mouthed" SmartSky, asserted that their system would be better than SmartSky's, represented that their system could be demonstrated in

---

[3] *See SmartSky v. Wireless Systems Solutions*, Case No. 1:20-CV-834, Order at 4 (M.D.N.C. Feb. 7, 2022) ("On January 13, 2021, following Procedural Order 8, the parties agreed to consolidate all pending claims and counterclaims into the arbitration, and all Defendants agreed to submit to the jurisdiction of the Tribunal and to be bound by the arbitration.")

[4] Certain sensitive trade secrets and confidential matters have been filed under seal with the court in this adversary proceeding by agreement of the parties. Where applicable, the confidential and trade secret information is noted as "REDACTED". Unredacted versions of the Tribunal's findings and arbitration award are filed in the case under seal and are available for inclusion in the case record if necessary.

six weeks and that a nationwide network could be up in 14 weeks. (Award ¶ 191.) After that zoom call, an important potential customer of SmartSky put a proposed contract on hold in order to evaluate the WSS/DAG system. (Award ¶ 192.)

9. Prior to its relationship with SmartSky, WSS "never developed an ATG system for communications with aircraft; . . . had limited experience with ground stations designed for LTE systems using beamforming technology; . . . had never developed ABR for aircraft; . . . did not have experience developing networks operating in the unlicensed 2.4 GHz band; and . . . was not experienced in getting products certified by the FAA or the FCC. *See, e.g.,* Tr.: 187-88; 759-62, 818-22; 1784-93." (Award ¶ 248.)

10. "The record further establishes that the press release and marketing materials prepared and distributed by Respondents (a) caused confusion in the marketplace about whether there was a new competitor offering an ATG System and (b) made raising capital more difficult for SSN. RX 1505 pp. 50-52. At least one significant, existing commercial prospect for SSN delayed proceeding with SSN's ATG Products because Respondents offered it their 'own' competing ATG System." (Award ¶ 289.)

11. Respondents engaged in a "pattern of deceptive conduct to misappropriate SSN's Intellectual Property, including by using pseudonyms, aliases, impersonations, and fake companies (*e.g.,* Tr.: 1743, 1745; CX-212); issuing a false press release and marketing materials concerning a supposedly FCC- and FAA-certified ATG System that did not in fact exist (Tr.: 1921, 1923; CX-152) and not retracting such press release (Tr.: 1925, 2189); and 'bad mouthing' the SSN ATG System to prospective customers." (Award ¶ 292.)

12. The Tribunal entered injunctive relief not only against WSS but also against DAG USA and DAG Israel as instrumentalities of WSS and the Grosses in their personal capacity and as officers of the corporate respondents. (Award ¶297.)

13. DAG Israel and DAG USA are alter egos of WSS. (Award ¶¶ 299, 300, 303, 308.)

14. The Grosses "misappropriated and conspired to misappropriate, SSN's trade secrets in violation of the DTSA and TSPA,[5] and thus are liable for common law conspiracy to violate such statutes." (Award ¶ 321.)

15. "The record established herein, when viewed as a whole, evidences that the Grosses **intentionally and maliciously**[6] misappropriated Claimant's trade secrets by, *inter alia*, marketing SSN's ATG Products as their own to SSN's main competitor and customer prospects, thus entitling SSN to an award of reasonable attorneys' fees against the Grosses for their misappropriation. *See* ¶¶ 360-64*, infra*." (Award ¶ 324, emphasis added.)

---

[5] Federal Defend Trade Secret Act, 18 U.S.C. § 1836 (the "DTSA") and the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 24-66-152, et seq. (the "TSPA").

[6] "'Willful' means intentionally," as opposed to "accidental or unavoidably." *Silicon Knights, Inc. v. Epic Games, Inc.*, 917 F. Supp. 2d 503, 518 (E.D.N.C. 2012). "Malicious," as that term was used by the Tribunal in its written decision, means "an action taken in a manner that evidences a reckless and wanton disregard of the plaintiff's rights." *Id.* at 519 (omitting internal quotation and citation). (Award ¶ 323.)

16. **"Respondents used alter egos and fictious names to circumvent contractual restrictions in the Teaming Agreement; Respondents issued a false press release and misleading marketing materials to create market confusion about competing ATG systems; Respondents denigrated SSN to business prospects; Respondents discouraged vendors from working with SSN; and Respondents made false reports to the FAA of defects in SSN's ABR units."** (Award ¶ 328.)

17. "[W]e hold that Respondents' unfair and deceptive acts **in trying to steal the core of SSN's business through the unfair acts** here described merit entry of a permanent injunction for the same reasons articulated with respect to WSS', DAG USA's, and DAG Israel's breaches of the Intellectual Property and Confidential Information provisions of the Teaming Agreement. *See* ¶¶ 287-97, *supra*." (Award ¶ 331, emphasis added.)

18. "Here, Respondents *falsely* advertised in both a press release and other marketing literature that they had developed an FAA and FCC certified ATG System (Velocity XG), which in fact did not exist, and passed off SSN ATG Products as their own. *See* ¶¶ 178-93, *supra*. And Respondents have admitted doing so. *See, e.g.*, ¶ 189, *supra*." (Award ¶ 336.)

19. The advertising at issue was deemed an "exceptional case" of false advertising under the Lanham Act. (Award ¶ 342.)

20. SmartSky is entitled to a permanent injunction against Respondents (Award ¶ 348.)

21. "The Grosses did not merely use SSN's trade secrets; they did so in a manner designed to evade detection, by using alter egos and pseudonyms. The Grosses specifically offered SSN's trade secrets to SSN's primary competitor, GoGo; specifically targeted prospects that SSN had actual and prospective relationship with, such as [REDACTED] and sought to sow confusion in the marketplace about the availability of marketing literature to industry press outlets purporting to pass off SSN's ATG System as their own and that of the companies they controlled. See ¶¶ 178-93, *supra*." (Award ¶ 363.)

22. "Based on the nature and content of the conduct of Respondents, including with respect to the press release and related activities referenced in ¶¶ 178-86 and 188-91, *supra*, we find the circumstances here to constitute an 'extraordinary case' of false advertising. The false advertising here goes well beyond simply overstating an attribute or making a false statement about a competing product. After being paid nearly $30 million by SSN to develop ATG Products, **Respondent WSS withheld delivery and simultaneously acted in concert with its alter egos, DAG USA and DAG Israel, to issue a press release offering the SSN ATG Products for sale under a new name, Velocity XG, as if they were their own.** *See* ¶¶ 178-93, *supra*. **The record establishes that all three of the Grosses were personally involved in those activities**. In addition to passing-off the ATG Products, the press release inaccurately claimed regulatory certifications had been obtained, knowingly conveying demonstrably false information as to advanced development and imminent availability. Respondents then distributed the press release to,

inter alia, prospective purchasers with which SSN was already engaged." (Award ¶ 366, emphasis added.)

23. **"**The record herein establishes that **the result of Respondents' unlawful activity was, as Respondents' specifically intended**, confusion in the marketplace as to the availability of competing ATG Systems, interference with important negotiations SSN was having with REDACTED, and loss of investor confidence in SSN." (Award ¶ 367, emphasis added.)

24. "Nor is there any dispute that Respondents did not retract the false press announcement about the Velocity XG system—even though they acknowledged that it was false and misleading." (Award ¶ 373.)

At trial, Ryan Stone, SmartSky's President and founder testified, as did David Gross (the Debtor). Based on that testimony, along with the documentary exhibits placed into evidence at trial, coupled with the relevant binding findings of the arbitration panel in the Award, the following material additional findings of fact are made:

  A. SmartSky was formed in 2011, and since that time has invested substantial amounts of money developing proprietary technology and products to provide ATG wireless broadband communications to airplanes using the unlicensed FCC radio band. SmartSky's proprietary ATG products include an airborne radio ("ABR"), remote radio head ("RRH"), and a baseband unit ("BBU") for which SmartSky had obtained both FCC and FAA certification by 2018. (Stone Testimony; Exs. 100, 101; Award ¶¶ 100-02.) SmartSky began providing ATG communications services to paying customers in 2022. (Stone Testimony.)

  B. From late 2017 to August 2020, WSS contracted with SmartSky to further develop and produce SmartSky's proprietary ATG products, including the ABR, RRH, and BBU, under contracts (including the Teaming Agreement) that protected SmartSky's IP and provided that the resulting work product from those efforts (the products and associated "Developed IP") would be "work for hire" owned by SmartSky and exclusive to SmartSky in the aviation field of use (with WSS prohibited from use in that field). (Stone Testimony, Award ¶¶ 103-110, 133, 216-32, 258.)

8

C. Debtor was originally a principal of WSS, but in 2018 formed and became the sole owner of DAG Israel, and subsequently DAG Wireless USA, LLC. DAG worked exclusively as a subcontractor to WSS, and here worked under WSS to develop the ATG products for SmartSky. (Stone Testimony; Gross Testimony.)

D. SmartSky paid WSS $30 million to develop and produce ATG products for it, but WSS/DAG were largely unsuccessful in accomplishing the work goals and producing viable products for ATG purposes. (Stone Testimony; Award ¶¶ 156-61, 195, 199, 205, 215.)

E. In August 2020, SmartSky was in competition with GoGo to be the first in the United States to deploy a viable ATG system in the unlicensed band in a commercially feasible manner. SmartSky was working to complete the deployment and activation of its ATG network and products for commercial operations but was delayed in doing so by WSS/DAG failing to meet its contracted workable technology goals. SmartSky had a number of longstanding contracts with major aviation industry players, including [Company A] and [Company B], to supply and install ATG equipment and products for business jets. Debtor was familiar with the state of this market based on discussions and working with SmartSky for nearly three years. Further, during the summer of 2020, Debtor and DAG prepared a written market analysis reflecting potential market revenues of over $540 million annually for business jets alone. (Stone Testimony, Gross Testimony; Ex. 184; Award ¶ ¶292, 320, 363.)

F. Beginning by at least August 2020, DAG and Debtor, its principal, engaged with WSS and the Gross family in what the Tribunal found to be a "pattern of deceptive conduct" that involved "try[ing] to steal the core of [SmartSky's] business." DAG used SmartSky's proprietary ATG products and developed IP to unfairly compete against SmartSky in the aviation field of use, including by mispresenting SmartSky's products as its own to the aviation market, to SmartSky's

9

own customers and prospects as well as SmartSky's competitor Gogo. (Stone Testimony, Award ¶¶ 178-93, 250, 259, 292 301-02, 306, 320-42, 361-73.)

    G.    This misconduct included the following, as detailed by Mr. Stone in his testimony and admitted in large part by Debtor at trial:

1. On August 11, 2020, DAG issued a press release written by Debtor announcing the launch of a "currently commercially available" and FCC and FAA DO-160 certified ATG wireless communications system called the Velocity XG made up of three existing DAG Wireless products. This press release was false—the Velocity XG system did not exist; it was not currently commercially available or certified and these products did not exist. (See Trial Ex. 152.) This press release was widely distributed in the aviation press with quotes from Debtor and from a DAG representative named Rob Johnson (a pseudonym for a person who did not exist). (Stone Testimony, Gross Testimony, Trial Ex. 153, 441, 448, Award ¶¶ 178, 188-89, 292, 301-02, 320, 328, 336, 363, 366.) The press release was sent to the media "under embargo until August 11, 2020" one day after a breach notice was sent to WSS and copied to Debtor. (Stone Testimony.)

2. Debtor prepared DAG promotional materials for the fake Velocity XG system depicting SmartSky's proprietary ATG products, IP and Developed IP (including photographs of SmartSky's products). DAG and WSS falsely represented and passed off these products as their own. (Stone Testimony, Gross Testimony, Ex. 5 at 1926-33, Exs. 151, 158, 159, 165, 166; Award ¶¶ 179, 189, 292, 301-02, 328, 336, 363, 366.)

3. Debtor communicated with and sent the false Velocity XG press release and promotional materials to several of SmartSky's customers and potential customers, including [Company A], [Company B], [Company C], and [Company D], as well as to SmartSky's main competitor, Gogo. In further attempts to compete with SmartSky and market the non-existent Velocity XG system, DAG entered into nondisclosure agreements and engaged in discussions about developing ATG products with some of those customers and prospects, including [Company A] and [Company C]. (Stone Testimony, Gross Testimony, Exs. 5, 151, 158-62, 167, 169-74, 179, 186, 188, 192, 451, Award ¶¶ 181-88, 292, 301-02, 320, 323, 328-29, 363, 366.) For example, Debtor's email communications with [Company A] evidenced detailed substantive communications about the ATG products he was representing DAG could provide. (Ex. 151.)

4. SmartSky filed suit against Debtor, DAG, WSS, and Laslo and Susan Gross in early September 2020 in the MDNC and moved for a preliminary injunction to restrain Debtor and DAG's ongoing efforts to steal SmartSky's ATG products and market them as their own (Stone Testimony). On November 9, 2020, in response to the

preliminary injunction motion, Debtor filed a sworn declaration in the MDNC case, admitting the following:

> There is no VelocityXG system, and there is no certification of any components of a potential VelocityXG system, and none of the Defendants, particularly DAG USA or DAG Israel, have the required elements to credibly engage the aviation field for the proposed VelocityXG system . . . .
>
> ***The certifications that would be required for the potential system (DO-160 & Supplemental Type Certificates ("STC")) are invasive, exhaustive*** and require many months if not years to successfully obtain. . . .
>
> ***None of the Defendants have rights to key controlled components necessary for*** the VelocityXG system ***such as proprietary antennas, specialized custom cabling for inside the aircraft and ground station, custom enclosures (boxes) for the ABR & Remote Radio Heads, and the cabin Wi-Fi Access Point*** . . . .
>
> ***In short, the [DAG] press release represented there to be a system that did not exist*** and was merely testing the market to determine potential demand, without an actual product.

Ex. 421; *see also* Award ¶ 189 (emphasis added).

H. DAG never retracted the press release or promotional materials or otherwise informed the aviation industry that DAG had no ATG products to sell. (Stone Testimony, Gross Testimony.) "Nor is there any dispute that Respondents did not retract the false press announcement about the Velocity XG system—even though they acknowledged that it was false and misleading." (Award ¶ 373, citing Award ¶ 190.)

I. Instead of retracting the press release or promotional materials, in April 2021, Debtor solicited and scheduled meetings with representatives of [Company E] and its parent company and affiliates seeking to interest them in buying or funding DAG's nonexistent ATG products. This action occurred contemporaneously with [Company E]'s board consideration of entering a contract with SmartSky valued in excess of $100 million, a contract that had been

11

negotiated over several months. (Stone Testimony.)

J. Debtor approached [Company E] in April 2021, after arbitration discovery had revealed to Debtor that SmartSky was pursuing sale of ATG products to [Company E] (Award ¶ 80, 408.) In late April 2021, Debtor had at least four separate communications with principals of [Company E] in which he (1) spoke about DAG's purported ATG products; (2) had a DAG nondisclosure agreement executed; (3) participated in a virtual meeting (along with his father Laslo Gross) where he presented a potential ATG system which could be developed in approximately a year, badmouthed SmartSky and represented that DAG's purported ATG system would be better than market competitors; and (4) had a separate call with another principal to discuss technical issues and merits of DAG's potential system.

K. According to Mr. Stone, [Company E] became concerned with the apparent confusion or perceived conflict of technology rights and put its proposed contract with SmartSky on hold. As of the trial date, it still had not entered into a contract with SmartSky, nor was one apparently imminent. These communications between Debtor and [Company E] representatives occurred after suit had been filed against Debtor in the MDNC and during the arbitration process.

L. Mr. Stone testified that Debtor's willful misconduct caused substantial harm and injury to SmartSky, including:

1. Causing [Company E] to delay proceeding with the $[xxx] contract with SmartSky;

2. Causing confusion in the aviation marketplace over whether DAG was a competitor;

3. Damaging SmartSky's goodwill and reputation in the market by creating doubts about its ATG system and when it would come to market;

    4. Causing a loss of investor confidence in SmartSky and negatively impacting its ability to access the capital markets; and

    5. Continuing these harms by failing to retract the press release or promotional materials.

    M.    At trial, Debtor did not deny the falsity of the press release and promotional material, but instead testified he was "merely testing the market" to determine potential demand and that the press release and promotional materials were created as market research.[7] (Gross Testimony.) Incredulously, Debtor testified that in the course of conducting these admittedly untruthful presentations and activities, he "never considered" or even "thought about SmartSky" and any effect such behavior might have on it. He offered no evidence to counter Mr. Stone's testimony concerning the hiatus or loss of the [Company E] deal.

    N.    Debtor and DAG were aware of the viability of the aviation market for ATG products, based on their work with SmartSky and their own detailed written analysis which reflected potential market revenues of over $530 million annually for business jets alone. (Stone Testimony, Gross Testimony, Ex. 184.) Debtor testified at trial that he decided the ATG aviation market was not viable around May 2021, which it must be noted is very close in time to the arbitration hearing and entry of a preliminary injunction prohibiting Debtor, DAG, and the other respondents from marketing or selling ATG products derived from SmartSky's products and Developed IP in the aviation field of use. (Award ¶ 81.) Meanwhile, Debtor continued to engage in activities that harmed SmartSky after receiving a cease and desist letter, being sued by SmartSky, and being subjected to a preliminary injunction enjoining the same conduct. Based on the surrounding facts and circumstances, the court finds Debtor's testimony regarding his intentions to be self-serving and incredulous.

---

[7] Essentially, he tried to invoke a "puffing" defense. Debtor also testified that he believed other companies routinely asserted false statements in press releases and marketing materials. Neither assertion is a convincing justification for his behavior, even if believable.

## LAW

A debt is not dischargeable in a bankruptcy case if it is the result of a willful and malicious injury caused by the debtor. Section 523(a)(6) provides, in pertinent part, that: "(a) A discharge under Section 727 … does not discharge an individual debtor from any debt —[…] (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Exceptions to discharge should be narrowly construed. *In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007). Plaintiff bears the burden of proving the non-dischargeability of the debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Farouki v. Emirates Bank Int'l., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *First National Bank v. Stanley (In Re Stanley)*, 66 F.3d 664, 667 n. 4 (4th Cir. 1995).

"The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977, 140 L. Ed. 2d 90 (1998); *see also In re Muhs*, 923 F.3d 377, 385 (4th Cir.), *cert. denied sub nom. TKC Aerospace Inc. v. Muhs*, 140 S. Ct. 607, 205 L. Ed. 2d 387 (2019) ("The Supreme Court and this court have decided that a debt arising from an injury attributable to mere negligent or reckless conduct does not satisfy the 'willful and malicious' requirement of (a)(6); in addition, it is not enough that the conduct underlying the injury was intentional. Rather, the debtor must have engaged in such conduct with the actual intent to cause injury." (citations omitted)).

At summary judgment, the court ruled as a matter of law that willfulness under Section 523(a)(6) had been established as a matter of law in the Award's binding, detailed findings. Therefore, the question of whether Debtor's behavior causing the injury leading to the debt was "malicious" within the meaning of Section 523(a)(6) was left for trial. (Summary Judgment Order

at 13.) "To qualify as malicious, the debtor must have acted with substantial certainty that harm would result or with a subjective motive to cause harm." *In re Coley*, 609 B.R. 298, 311 (Bankr. E.D.N.C. 2019); *In re Cobham*, 528 B.R. 283 (Bankr. E.D.N.C. 2015); and *Select Bank & Trust Co. v Crawford, (In re Crawford),* Case No. 21-1296-5-JNC, Adv No 21-00092-5-JNC, 2022 WL 1509463 *11 (Bankr. E.D.N.C. May 12, 2022).

### ANALYSIS

Based on the facts found by the Tribunal in the Award along with the testimony and exhibits from trial, which the court has weighed for credibility and probative value, the court finds Debtor's actions were malicious as defined under Section 523(a)(6) and materially harmed SmartSky. Debtor, acting individually and through his US and foreign DAG companies, had been hired to work with SmartSky for several years as a subcontractor through WSS. In the course of that work, he learned and came into possession of SmartSky's trade secrets and confidential material information. He purloined those materials and used them to compete directly with SmartSky in a closed business market environment over a lengthy time period.

Not only did Debtor issue admittedly false press releases and promotional materials using SmartSky's confidential information and products, but he also continued such behavior after being warned in a cease and desist letter, after being sued, and while defending the arbitration proceeding. Adding fuel to the fire, in the course of the arbitration proceeding, Debtor engaged in substantial discovery abuses involving that same confidential material. Pointedly, he contacted and engaged in detailed discussions with one of SmartSky's largest potential customers, [Company E], ostensibly to sell to and provide it with ATG technology he took from SmartSky.

From the testimony and documents tendered at trial, the evidence overwhelmingly shows that while under a duty of confidentiality, Debtor knowingly used SmartSky's technology to get

and stay ahead of SmartSky in order to sell the use of that technology to [Company E] and others in the market. He acted or continued to act even after warning from SmartSky not to use its technology. Ascending to the crest of the technology surfer wave would effectively remove SmartSky, and other competitors, from the playing field as aviation device owners would become locked into the first vendor due to high costs in outfitting jets and establishing a viable nation-wide ATG tower technology system. A contiguous ATG system yielding unbroken coverage in the continental United States would require a massive undertaking, resulting in a steadfast hold of the customer even if another seller/provider with better technology appeared later. It is truly a case of the early bird catches the whole technology worm. Knowing the closed and finite nature of this market, Debtor's actions in surreptitiously obtaining confidential technology and trade secrets from SmartSky were not only willful but were also malicious in trying to freeze SmartSky out of the closed market by torpedoing its [Company E] sale. That deal remains on hiatus to this day.

Mr. Gross cites *Poston v. Toomey (In re Toomey*, 2012 WL 719863 (Bankr. E.D.N.C. Mar. 5, 2012) and contends that like the debtors in *Toomey*, his actions were not undertaken with substantial certainty to cause harm. He maintains that his actions in contacting [Company E] were relatively innocent, being merely a "market test" of an immature technology. However, *Toomey* is readily distinguishable. In that case, Mr. and Mrs. Toomey were relatively unsophisticated consumer debtors. No evidence was presented in that case that they understood that drawing from a line of credit would result in harm to the plaintiffs by encumbering the latter's property. Here, Debtor is an experienced businessperson who was hired to improve SmartSky's sophisticated technology, but per the binding arbitration panel findings, he instead acted intentionally and in conjunction with family members and their corporate entities to steal the core of SmartSky's technology and its business contacts on

16

multiple occasions, even after receiving a breach letter, a cease and desist letter, being sued, and while participating in an arbitration process. Unlike the Toomeys, from the testimony at trial, it is apparent that Debtor fully understood the implications of his actions and purposefully proceeded on a course designed to harm SmartSky.

Debtor utilized his unique expertise and knowledge to accomplish not only a surreptitious taking of SmartSky's technology, but he went after its customers too for his own financial gain and to the material detriment of SmartSky. It strains all bounds of credibility to find that Mr. Gross would approach SmartSky's most important potential customer with what Debtor says was unworkable technology merely to "test the market." The purpose of Debtor in approaching [Company E] under false pretenses can only be explained as an attempt to skyjack the customer and retain it solely for himself, WSS, and DAG to the pointed exclusion of SmartSky. Mr. Gross was going out of his way to harm SmartSky. The court can only conclude from the totality of the circumstances that this second step was undertaken by Mr. Gross with subjective motive to cause harm to SmartSky and in a manner designed with substantial certainty that harm would result. In other words, he acted maliciously as that term is contemplated under section 523(a)(6).

## CONCLUSION

Plaintiff has proven by a preponderance of the evidence the subject debt is non-dischargeable under 11 U.S.C. § 523(a)(6) as caused by and due to willful and malicious injury by the Debtor. The Award and debt remains in full force, unaffected by Debtor's discharge in his Chapter 7 case, 22-00517-5-JNC. A separate judgment consistent herewith is entered simultaneously in this adversary proceeding.

**END OF DOCUMENT**